UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:03cv00073-WOB

ELIZABETH ANN JORLING                                        PLAINTIFF

VS.                              OPINION AND ORDER

HABILITATION SERVICES, INC., ET AL                     DEFENDANTS


This is an age discrimination case in which a jury found for the plaintiff resulting in a judgment totaling $1,805,000.00. The case is now before the court on defendants' motion for remittitur (Doc. #42), plaintiff's motion for leave to file a surreply (Doc. #51), and plaintiff's application for attorney's fees and costs (Doc. #43).

### Factual and Procedural Background

Plaintiff Elizabeth Ann Jorling is a licensed Occupational Therapist in Ohio. Her date of birth is November 15, 1939.

In 1985, Jorling founded a private occupational therapy practice called Therapeutic Management Group, Inc. ("TMG"). In 1993, Jorling sold TMG to Habilitation Services, Inc. ("HSI"), a physical therapy provider. The Chief Executive Officer of HSI at that time was Mike Levenson, a professional acquaintance of Jorling.

In conjunction with this sale, Jorling became employed by HSI as Occupational Therapy Director at an annual salary of $55,000, plus benefits. A written agreement between plaintiff and HSI, dated August 19, 1993, provided that HSI would pay Jorling a 10% commission on the revenue received by HSI on TMG

contracts for the life of those contracts.[1]

From 1993 to January 1999, Jorling held the position of Occupational Therapy Director, during which time she received annual raises of five percent.  In late 1998, Levenson became seriously ill, and the management of HSI underwent restructuring. The Executive Director, Sandy Grether, stepped down and was replaced by Melissa Foley.  In addition, the departmental director positions were all eliminated.  Jorling testified that, around this time, many new, younger managers came on board through ViaQuest, Inc., a management company in Columbus, Ohio that participated in the direction of HSI's operations.

After the Occupational Therapy Director position was eliminated, Jorling became Community and Contract Site Coordinator.  In this role, Jorling was responsible for HSI's marketing activities.  She also continued to oversee the occupational therapists and carry her own client therapy caseload.

In July 1999, plaintiff received her annual performance review and inquired about whether she would receive a merit increase.  Foley gave Jorling a copy of an email message dated March 30, 1999, in which Richard Johnson, ViaQuest's President, stated that Jorling's salary (as well as that of Sandy Grether) should be frozen until they "come into line."

After 1999, plaintiff received no further performance

---

[1]A second contract was entered into in 1999, which provided that Jorling would receive the 10% commission on certain TMG accounts for as long as Jorling was employed by HSI.

reviews and no salary increases.  In late 1999, Jorling's hours were reduced from 40 to 32 per week, resulting in a 20% reduction in her salary.

Jorling testified that, during this time, she began to feel that her opinions were not valued by HSI and ViaQuest management, and that the new, younger managers were treated better.  She also testified that she and Grether were the only managers at HSI then over the age of forty.

In Spring of 2001, Jorling's title changed to Regional Director of Marketing.  In this role, she continued her existing duties but also assumed marketing for the Columbus area.  In July 2001, another person was hired to oversee the occupational therapy staff, which had comprised approximately 35% of Jorling's time.

In the fall of 2001, HSI began developing a new logo, mission statement, statement of values, and business cards. Jorling testified that she felt she was intentionally excluded from this process which, in her view, fell within her marketing responsibilities.  She confronted Stephanie Loomis, the Cincinnati facility director, about why she had not been involved.  Loomis told plaintiff that "they were looking for fresh ideas and new blood."  Jorling was never provided with any business cards with the new HSI logo or her new title.

In December 2001, Jorling's contract management and regional marketing duties -- comprising approximately 35%-40% of her job -- were transferred to Loomis.  At the same time, Jorling began

3

developing the 2002 first quarter marketing action plan.  She testified that she asked weekly to meet with Holly Thompson, HSI's Regional Director, to discuss the plan, but that no such meeting was held.  In early 2002, Jorling informed Thompson of several leads she had received on new contracts.  Thompson told Jorling to pass the leads on to Loomis.

In early April, 2002, Chris Wolf, ViaQuest's Executive Director, telephoned Jorling and told her that they needed to meet to discuss marketing.  When they met, Wolf informed Jorling that her position was going to be eliminated.[2]  Jorling inquired about what would happen to her, and Wolf told her that perhaps HSI could utilize her as a consultant on an "as needed" basis. Jorling told Wolf that she needed full-time employment.  She told him that she knew of an Occupational Therapist position that was soon to be available within HSI.  Wolf told her he would check into it and get back to her.

April 22, 2002, was Jorling's last day of employment with HSI.  That day, she met Wolf and Rebecca Meister, ViaQuest's Vice-President of Human Resources, at a local restaurant.  They discussed the fact that no other positions would be available for Jorling, including any consulting arrangement.  Meister told Jorling that she could clean out her desk the following Friday and that someone from Human Resources would be there to oversee

---

[2]The parties stipulated prior to trial that Chris Wolf, Rebecca Meister, and Richard Johnson -- all of whom were ViaQuest employees -- participated in the decision to eliminate Jorling's position, as did Holly Thompson of HSI.

her actions.

At this meeting, Meister and Wolf also presented Jorling with a severance agreement offering her nineteen weeks of pay in exchange for a release requiring Jorling to waive numerous legal claims, including any claims for age discrimination.  Jorling ultimately declined to accept the severance agreement.

Jorling filed this lawsuit on January 28, 2003, naming both HSI and ViaQuest as defendants and alleging the following claims: (1) discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; (2) age discrimination under Ohio Revised Code § 4112.14; (3) breach of contract; and (4) breach of Ohio public policy against age discrimination.  Prior to trial, Jorling voluntarily withdrew her contract claim.

The case was tried to a jury on March 28, 29 and 30, 2005. The court then stood in recess for two days, and the case was submitted to the jury on April 4,2005.  The jury retired to deliberate at approximately 11:00 a.m. and returned a verdict at approximately 12:30 p.m.  The jury found that age played a part in defendants' decision to terminate plaintiff's employment, and that defendants had not proven that they would have made the same decision regardless of plaintiff's age.  The jury awarded plaintiff $190,000 in back pay, $207,280 in front pay, $77,720 in emotional damages, and $950,000 in punitive damages.  The jury also found that defendants' violation of the ADEA was willful.

Pursuant to this verdict, the court entered judgment in plaintiff's favor against HSI and ViaQuest, jointly and

5

severally, in the sum of $1,805,000.00.

Defendants have now filed a "Motion for Remittitur" pursuant to Rule 59(e), and plaintiff has moved for attorneys' fees and costs.

### *Analysis*

### I.  __Procedural Posture__

At the outset, the court comments on the procedural posture of this case.  Specifically, it notes that two issues typically raised in post-trial motions are <u>not</u> before the court here.

First, defendants have not made a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), nor could they.  This is because, with a very narrow exception discussed below, defendants never made a Rule 50 motion during trial.  They are therefore foreclosed under Rule 50 from challenging the legal sufficiency of the evidence supporting the jury's verdict.  *See Jackson v. City of Cookeville*, 31 F.3d 1354, 1357 (6th Cir. 1994) ("Therefore, a party who has failed to move for a directed verdict at the close of all the evidence, can neither ask the district court to rule on the legal sufficiency of the evidence supporting the verdict for his opponent nor raise the question on appeal.").

As the Sixth Circuit has stated, this "waiver rule serves to protect litigants' Seventh Amendment right to trial by jury." *Libbey-Owens-Ford. Co. v. Insurance Co. of North America*, 9 F.3d 422, 426 (6th Cir. 1993) (citation omitted).  *See also American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)

6

(noting that policy of waiver rule is "to narrowly restrict the grounds used to overturn a jury verdict by requiring that parties raise important issues *before* the case is submitted to the jury") (emphasis in original).

Second, while defendants nonetheless could have moved for a new trial pursuant to Fed. R. Civ. P. 59(a) on the grounds that the verdict is against the greater weight of the evidence, they have not done so. Instead, defendants have moved only to alter or amend the judgment under Rule 59(e). It is that motion only, then, that is addressed herein, in addition to plaintiff's motion for attorneys' fees and costs.

## II.  **Motion for Remittitur**

As a general rule, "a jury verdict should not be remitted by the court 'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994) (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). Thus, the court should reduce a jury's award only if it is (1) beyond the range supportable by proof, (2) so excessive as to shock the conscience, or (3) the result of a mistake. *Slayton v. Ohio Dep't of Youth Services*, 206 F.3d 669, 679 (6th Cir. 2000) (citation omitted).

Any ambiguity in what the plaintiff would have received but for the discrimination "should be resolved against the discriminating employer." *United States v. City of Warren*, 138

7

F.3d 1083, 1097 (6th Cir. 1998) (citation omitted).

A district court's decision on a motion for remittitur is reviewed for an abuse of discretion. *Jackson*, 31 F.3d at 1359.

**A.**   **Back Pay**

Defendants argue that the back pay award of $190,000.00[3] is excessive because it is unsupported by the testimony and fails to take into account plaintiff's mitigation, as well as her voluntary leave of absence since January 1, 2005.

Pursuant to the "make whole" purpose of back pay in employment discrimination cases, the Sixth Circuit has stated:

> The back pay award should completely redress the economic injury the plaintiff has suffered as a result of discrimination.  <u>It should include the salary, including any raises, which plaintiff would have received but for the discrimination, as well as sick leave, vacation pay, pension benefits and other fringe benefits she would have received but for discrimination.</u>

*Suggs v. Servicemaster Educ. Food Mgmt.*, 72 F.3d 1228, 1233 (6th Cir. 1996) (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir. 1988)) (emphasis added).

Further, while a plaintiff has the duty to mitigate her damages, it is the employer who "carries the burden of establishing that damages were lessened or might have been lessened by the plaintiff." *Jackson*, 31 F.3d at 1359 (citation omitted).  However, the jury must consider mitigation of damages where the employer presents evidence to that effect. *Id.*  *See also Skalka v. Fernald Env. Restoration Mgmt. Corp.*, 178 F.3d

---

[3]The jury noted in parentheses beside this figure ("3 yrs salary - benefits").

414, 426 (6th Cir. 1999) (holding that remittitur on remand should reflect plaintiff's "new employment to the extent that any rational jury would have found this income to be proven").

The parties agree that Jorling's annual salary at the time of her termination was $53,494.00. Rebecca Meister, defendants' Human Resources official, testified that plaintiff's healthcare benefits were valued at 12%-13% of her salary. Thus, at the time of her termination, Jorling's annual compensation (salary plus healthcare benefits) was at least approximately $60,448.22.[4] Multiplying this amount by three years yields $181,344.66, a figure close to the $190,000 that the jury awarded, even without allowing for other benefits or raises.

Meister also testified that, unbeknownst to her until this litigation ensued, Richard Johnson had ordered Jorling's salary frozen in 1999. The reason given was that Jorling's salary was over the maximum for her pay grade. However, Meister conceded that under defendants' "Merit Increase Guidelines Matrix," employees whose salaries were over the maximum were still eligible for merit increases of 0%-3%, depending on their performance ratings. Thus, the jury could reasonably have concluded that Jorling's back pay should include such increases. Allowing for raises of 1%-3% increases the permissible back pay range to $183,164.15 to $186,839.40.

Meister also testified that HSI employees at the director level and above received bonuses in 2002 equal to 3%-4% of their

---

[4]$53,494 + ($53,494 x 13%)= $60,448.22

base salaries. The jury could reasonably have concluded that Jorling, as Director of Marketing, would also have been entitled to such bonuses. Allowing for annual bonuses of 4% over the 3-year back pay period increases the back pay range to $187,508.08 to $193,453.18.

Next, it was undisputed that Jorling was contractually entitled to a 10% annual commission on the occupational therapy gross revenues on former TMG accounts for the duration of her employment with HSI. But for her unlawful termination, she would have continued to receive such commissions, and those amounts are thus properly included in the back pay award.

Meister testified that Jorling's 2001 commission was approximately $13,000. Multiplying that amount by the 3-year back pay period yields $39,000 which, when added to the above amounts, increases the permissible back pay range to $226,508.08 to $232,453.18.

The final issue regarding the back pay award is mitigation. Defendants argue that the back pay award must be reduced by $57,184.19, the total it contends plaintiff earned from her job with Warren County during 2002, 2003, and 2004. However, defendants only introduced into evidence plaintiff's Warren County IRS form W2s for the years 2002 and 2003, which totaled $31,350.47. (Def. Exh. 18)[5] Although plaintiff testified that her income in 2004 from Warren County was "similar" to 2003,

[5]The court notes that defense counsel indicated that defendant was provided with a copy of plaintiff's 2004 W2. (Trial Transcript, Mar. 30, 2005, at 131)

defendant did not introduce into evidence plaintiff's 2004 W2, or any other document reflecting the amount she actually earned for that year.

The jury thus did not have before it any documentation of plaintiff's 2004 income, and it reasonably could have concluded that defendant did not carry its burden of proving what amount plaintiff earned in mitigating employment for that year.  It is reasonable, therefore, for the jury to have considered only plaintiff's 2002 and 2003 income.  Reducing the above calculations by plaintiff's income for 2002 and 2003 ($31,350.47) yields a permissible back pay range of $195,157.61 to $201,102.71.

The back pay awarded by the jury is less than these amounts, the court thus cannot say that the award is beyond the maximum that the jury could reasonably have determined would fairly compensate plaintiff.[6]

**B.    Front Pay**

Although reinstatement is the presumptively favored equitable remedy in ADEA actions, the Sixth Circuit has held that it is not appropriate in certain cases, including those where the plaintiff has found other work.  *See Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (citation omitted).  In

---

[6]It bears noting that these calculations represent merely some of the ways the jury could have arrived at the figure they did.  As the Sixth Circuit has noted, the court can never know how the jury actually reached its calculation: "Rather, it matters only that the award itself is supportable by a reasonable interpretation of the evidence." *Jackson v. City of Cookeville*, 31 F.3d 1354, 1361 (6th Cir. 1994).

11

such cases, the Sixth Circuit has approved front pay as an available form of equitable relief. *Id.*

The determination of the propriety of a front pay award is for the court, while the determination of the amount of the award is a jury question. *Id.* "Determination of when to award front pay is within the discretion of the trial court, and such awards are reviewed under the abuse of discretion standard." *Suggs v. Servicemaster Educ. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir. 1996) (citation omitted).

Generally, in awarding front pay, the following factors are relevant: "(1) the employee's future in the position from which she was terminated; (2) her work and life expectancy; (3) her obligation to mitigate her damages; (4) the availability of comparable employment opportunities and the time reasonably required to find substitute employment; (5) the discount tables to determine the present value of future damages; and (6) other factors that are pertinent in prospective damage awards." *Id.* (citation omitted).

Defendants first argue that a front pay award is inappropriate because the Director of Marketing position that plaintiff held was eliminated and she thus could have had no "future" in that job. However, the jury expressly found that age was a motivating factor in defendants' decision to eliminate that position, and that they would not have made the same decision in the absence of that unlawful motive. Therefore, a front pay award is appropriate to place plaintiff in the same position she

12

would have occupied "in the absence of the discrimination." *Suggs*, 72 F.3d at 1234. *See also Lewis v. Quaker Chem. Corp.*, Nos. 99-5405, 99-5482, 2000 WL 1234356, at *10 (6th Cir. Aug. 24, 2000) (rejecting argument that front pay award was inappropriate because position held by plaintiff was "eliminated").

However, defendants correctly note that a plaintiff has a duty to mitigate her future lost earnings. *See Jackson v. City of Cookeville*, 31 F.3d 1354, 1358-59 (6th Cir. 1994). As with back pay, the employer bears the burden of establishing that such damages were lessened or might have been lessened by the plaintiff. *Id.* at 1359. Where the employer presents evidence of the plaintiff's ability to earn in the future, the jury must take that into account in fashioning a front pay award. *Id.*

Here, the jury awarded plaintiff $207,280.00 in front pay. Beside this figure, the foreperson wrote "3 yrs. 9 mo. future salary." This amount thus equates to an annual salary of $55,274.66, which is approximately what plaintiff would have been earning in base salary at HSI at the time of trial, assuming annual raises of 2% up to that point. Using this amount as the starting point for a front pay award is thus reasonable.

However, in calculating its front pay award, the jury does not appear to have considered the evidence presented by defendants regarding plaintiff's ability to earn in alternative employment in the future. Defendants submitted evidence that plaintiff was able to secure a new job with Warren County shortly after she was terminated from HSI, and that she earned $25,823.60

13

in that job in 2003. This is firm evidence of plaintiff's ability to mitigate her future damages which the jury was obligated to consider. *See Jackson*, 31 F.3d at 1359.

Therefore, the court will reduce the front pay award by $96,838.65, which represents annual mitigation income to plaintiff of $25,823.60, multiplied by the 3-year, 9-month front pay period. Thus, the front pay award should be remitted to $110,441.35.

Next, defendants argue that plaintiff's front pay award should be "cut off" as of January 1, 2005, the date she took a leave of absence from her job with Warren County. Defendants argue that plaintiff introduced no evidence about her intention to return to work or when she planned to retire.

Defendants' argument ignores the fact that it is the employer who bears the burden of proving a failure to mitigate future damages. *Id*. Defendants elicited no testimony suggesting that plaintiff intended not to return to work, that she had decided to retire, or that she had otherwise voluntarily taken herself out of the workforce indefinitely. In the absence of such evidence "front-pay damages are not an abuse of the court's discretion." *Lewis v. Quaker Chem. Corp.*, Nos. 99-5405, 99-5482, 2000 WL 1234356, at *11 (6th Cir. Aug. 24, 2000).

Finally, defendants argue that the front pay award must be reduced to present value. However, the front pay award here does not appear to include annual raises to plaintiff over the course of the front pay period. In such cases, the Sixth Circuit has

14

held that it is an abuse of discretion for the trial court to make a present value reduction. *See Jackson*, 31 F.3d at 1360.

### C. **Emotional Distress**

Defendants' several arguments as to why the $77,720.00 emotional distress award should be thrown out are not well-taken.

First, defendants now attempt to challenge the legal basis for such an award[7] and the sufficiency of the evidence supporting such damages. However, as noted previously, defendants have waived those arguments by their failure to make an earlier Rule 50 motion. *See American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir. 1997); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1357-58 (6th Cir. 1994); *Libbey-Owens-Ford Co. v. Insurance Co. of North America*, 9 F.3d 422, 425-27 (6th Cir. 1993).

Second, defendants' argument that the award is suspect because it "bears no reasonable relationship to any other figure awarded and is wholly unexplainable" is misplaced. On a motion for remittitur, the only question is whether the award is "beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Jackson v. City of Cookeville*,

---

[7]Defendants argue that the evidence does not satisfy the elements of the tort of intentional infliction of emotional distress. However, plaintiff never brought such a cause of action. Rather, emotional distress damages were awarded pursuant to Count IV of the Complaint, the tort claim for "Breach of Ohio Public Policy" based on age discrimination. As discussed below, this cause of action may be brought in conjunction with federal and state statutory age claims.

31 F.3d 1354, 1359 (6th Cir. 1994) (citation and internal quotations omitted).[8]

Plaintiff testified that she was "devastated" at being terminated; that she suffered from low self esteem, anxiety and sleeplessness; and that she and her husband were forced to sell their new house as a result of her losing her job. (Trial Transcript, Mar. 30, 2005, at 72-73)

In light of this testimony, the award of $77,720 for emotional harm is not "so incongruous to shock the conscience, fall outside the bounds supportable by proof, or suggest mistake." *Slayton v. Ohio Dep't of Youth Services*, 206 F.3d 669, 680 (6th Cir. 2000). *See, e.g., Knight v. The Metropolitan Gov't of Nashville and Davidson County, Tennessee*, No. 03-6520, 2005 WL 758239, at *6 (6th Cir. April 4, 2005) (upholding $150,000 award for emotional harm which occurred as result of disability discrimination where plaintiff testified regarding his emotional distress and financial hardship resulting from discrimination); *Miller v. Alldata Corp.*, No. 99-2035, 2001 WL 777432, at *9-10 (6th Cir. July 6, 2001) (upholding emotional distress award of $300,000 for gender discrimination); *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1082 (6th Cir. 1999) (emotional distress award of $70,000 was not excessive); *Turic v. Holland Hosp., Inc.*, 85 F.3d

---

[8]Moreover, as plaintiff points out in her responsive memorandum, the amount of $77,720 is not "wholly unexplainable" as defendants allege because the sum of all compensatory damages awarded by the jury (back pay, front pay, and emotional distress) is exactly $475,000.

1211, 1215 (6th Cir. 1996) (holding that discrimination plaintiff's own testimony, coupled with circumstances of case, can justify compensatory damages award).

> **D.**  **Liquidated Damages**

The ADEA allows additional liquidated damages if an employer's violation of the Act is "willful."  29 U.S.C. § 626(b).  To find "willfulness," the jury must conclude by the preponderance of the evidence that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the ADEA.  *Skalka v. Fernald Env. Restoration Mgmt. Corp.*, 178 F.3d 414, 423 (6th Cir. 1999) (citation omitted).  It is not sufficient to show that the employer was merely negligent or that it knew that the ADEA was "in the picture."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 615 (1993) (citation omitted).  On the other hand, to prove willfulness, the plaintiff does not have to demonstrate that the employer's conduct was "outrageous" or show that age was the predominant, rather than determinative, factor in its decision.  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 615 (1993).

Here, defendants argue that the jury's finding of willfulness is not supported by the evidence.  Again, however, defendants never made a Rule 50 motion for judgment as a matter of law as to willfulness.  They have thus waived any substantive challenge to this portion of the verdict.  *See American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir. 1997);

17

*Jackson v. City of Cookeville*, 31 F.3d 1354, 1357-58 (6th Cir. 1994); *Libbey-Owens-Ford Co. v. Ins. Co. of N. A.*, 9 F.3d 422, 425-27 (6th Cir. 1993).

Defendants have moved only to alter or amend the judgment under Rule 59(e). However, a motion to alter or amend may not be used to raise an issue for the first time when the issue could have been raised prior to entry of judgment. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)(citation omitted).

Moreover, the court concludes that, even in the absence of waiver, the willfulness finding should not be overturned. Viewed cumulatively, the evidence supports a reasonable inference that defendants showed a reckless disregard for whether Jorling's age played a role in the decision to eliminate her position. There was testimony about the influx of very young managers in 1999 and 2000 after Mike Levenson fell ill; the ensuing diminution in plaintiff's responsibilities; the irregularities in her receiving no further performance reviews or salary increases after 1999; the seemingly cursory review of her marketing position by Thompson and Wolf; the contradiction in Wolf's and Thompson's testimony as to how the decision to eliminate Jorling's position was actually made; the fact that Meister was told that Jorling was not "meeting goals that had been established in marketing" and Meister's failure to make any inquiry into the basis for this

18

assertion; the fact that no evidence of any such "goals" was ever produced at trial; the fact that, between the time Jorling assumed marketing duties in 2001 and the time that she was told that her position was to be eliminated, no one ever told her that her marketing performance was below expectations; the fact that Jorling was the only HSI employee ever to be presented with a severance agreement containing a release of claims; and the fact that defendants discussed the possibility that Jorling would file an age discrimination lawsuit.

While this evidence does not necessarily show that defendants behaved outrageously, it does support a finding that they were reckless in disregarding the possibility that Jorling's age had factored impermissibly in the decision to eliminate her position. *See Skalka v. Fernald Env. Restoration Mgmt. Corp.*, 178 F.3d 414, 423 (6th Cir. 1999) (upholding jury finding of willfulness where plaintiff's discharge was dramatic departure from company procedures, was highly "visible" to top management, and where employer failed to investigate whether its managers were making discriminatory decisions).[9]

---

[9]Defendants argue that the fact that they consulted with legal counsel undermines the finding of willfulness because it shows they acted reasonably. The Sixth Circuit has recognized such an argument where an employer consults with legal counsel before making the employment decision in an attempt to comply with the law. *See Hoffman v. Prof. Med Team*, 394 F.3d 414, 419-20 (6th Cir. 2005). Here, however, there was no testimony that defendants sought legal counsel <u>before</u> making the decision to terminate plaintiff in order to ensure that the decision was lawful. Instead, the testimony was that they sought legal advice

E.    **Punitive Damages**

1.    **Rule 50 Waiver**

Defendants make several arguments as to why the punitive damages award should be vacated.  However, for several reasons, defendants have waived their right to assert these arguments in a post-trial Rule 50 motion.

First, defendants now argue that the Ohio public policy tort claim -- on which the punitive damages claim is predicated -- cannot be brought as a matter of law because the federal and state statutory causes of action provide adequate and exclusive remedies for age discrimination.  However, defendants never asserted such a theory prior to trial[10] or at any time during trial.

Rule 50 and accompanying case law are clear that a movant may assert in a renewed motion for judgment as a matter of law only those grounds preserved in a pre-verdict motion for judgment.  *See generally* 9 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 50.43[3][a] (3d ed. 2002).  *See also American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir.

---

*after* that decision had been made for the purpose of preparing the severance agreement and release of claims that was presented to Jorling.  This does not demonstrate that defendants were attempting to comply with the ADEA in their decision to eliminate Jorling's position, only that they were attempting to secure a severance agreement with a binding release of ADEA claims.

[10]The record reveals that no motion for summary judgment was filed in this matter.

1997) (quoting Advisory Committee Notes stating that a "post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion" and holding that judgment as a matter of law "is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury").

Therefore, defendants are barred from raising this new legal theory at this juncture.[11]

The only motion defendants' counsel made as to punitive damages came at the close of plaintiff's case, when counsel stated: "I would move that the counts for punitive damages be eliminated, as there has been no testimony, whatsoever, as to any malice or intentional actions." (Trial Transcript, March 30, 2005, at 141-42)

However, counsel did not renew this motion at the close of all the evidence. Defendants have therefore waived their right to resurrect this argument in a post-verdict motion. *See* 9 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 50.20[3] (3d ed. 2002) (noting that "a party who moves for judgment after an

---

[11]Moreover, the current state of the law in Ohio appears to be that a plaintiff can simultaneously bring a statutory age discrimination claim under O.R.C. § 4112.14 and a tort claim for breach of Ohio public policy. *See Gessner v. City of Union*, 823 N.E.2d 1, 5 (Ohio App. 2004); *Mercurio v. Honeywell*, No. C-1-02-275, 2003 WL 966287, at *2-*3 (S.D. Ohio Mar. 5, 2003).

In addition, defendants agreed to the inclusion of the public policy tort claim in the parties' Joint Final Pretrial Memorandum. (Doc. #18, at 6-7)

21

opponent's opening statement <u>or at the close of the opponent's</u>
<u>evidence</u> must ordinarily reassert the motion at the close of all
the evidence or risk waiving the right to renew the motion under
Rule 50(b)"). *See also Fisher v. Ford Motor Co.*, 224 F.3d 570,
574 (6th Cir. 2000) (noting that trial court correctly concluded
that party waived right to make post-trial Rule 50 motion by
failing to make motion for judgment as a matter of law at the
close of all the evidence); *Bolt*, 106 F.3d at 160 (quoting Rule
50(b) and noting that this "rule has long been read to say that a
motion for directed verdict made at the close of the evidence is
a prerequisite to a motion for judgment as a matter of law on the
same grounds"); *Jackson v. City of Cookeville*, 31 F.3d 1354, 1357
(6th Cir. 1994) ("It is well-settled that a court can only
consider a motion for judgment notwithstanding the verdict *only*
*if* the moving party has previously made a motion for directed
verdict at the close of all the evidence.") (italics in
original); *Libbey-Owens-Ford Co. v. Ins. Co. of N. A.*, 9 F.3d
422, 426 (6th Cir. 1993) ("Pursuant to Rule 50(b) of the Federal
Rules of Civil Procedure, a party may move post-trial for
judgment notwithstanding the verdict provided that the party
moved for a directed verdict after the close of the evidence.").

This rule serves important policies:

> The requirement that the motion for a directed verdict must
> be made at the close of all the evidence to be effective
> under Rule 50(b) is perhaps a strict one. . .  But it serves
> the important purpose of alerting the opposing party to the

22

alleged insufficiency of the evidence at a point in the trial where that party may still cure the defect by presenting further evidence.

<u>Failure to renew an earlier motion for a directed verdict may lull the opposing party into believing that the moving party has abandoned any challenge to the sufficiency of the evidence once all of the evidence has been presented.  If the moving party is then permitted to make a later attack on the evidence through a motion for judgment notwithstanding the verdict or on appeal, the opposing party may be prejudiced by having lost the opportunity to present additional evidence before the case was submitted to the jury.</u>

*Farley Transp. Co., Inc. v. Sante Fe Trail Transp. Co.*, 786 F.2d 1342, 1346 (9th Cir. 1985) (internal quotations and citation omitted) (emphasis added).  *See also Libbey-Owens-Ford*, 9 F.3d at 426 ("Further, the rule serves to prevent tactical victories at the expense of substantive interests.") (internal quotations and citation omitted).

These concerns are particularly applicable here.  After the close of plaintiff's case in chief, additional testimony was elicited from defendants' witnesses that was relevant to defendants' motives and thus relevant to the punitive damage issue.  By failing to renew their motion at the close of all the evidence, defendants conveyed the impression that they had abandoned their challenge to the sufficiency of the evidence on the punitive issue.  That message was further reinforced by the fact that, during the jury instruction charge conference held on April 4, 2005, defendants lodged no objection to the giving of

23

the punitive damage instruction.[12]

Therefore, defendants are foreclosed from now challenging the sufficiency of the evidence underlying the jury's award of punitive damages.

### 2.   __Amount of Punitive Damage Award__

A court may order a remittitur if an award of punitive damages is "grossly excessive." *BMW of N.A. v. Gore*, 517 U.S. 559, 568 (1996).  In determining whether an award is excessive a court should consider (1) the degree of reprehensibility of the conduct, (2) the disparity between the harm or potential harm suffered and the punitive award; and (3) the difference between the punitive damages and the civil penalties authorized or imposed in comparable cases.  *Id.* at

In determining "reprehensibility," the court considers a number of "aggravating factors" including whether the harm inflicted was more than "purely economic in nature" and whether a defendant's actions constitute trickery or deceit" as opposed to mere negligence. *Argentine v. United Steelworkers of American,*

---

[12]The colloquy as to the punitive instruction was brief:

THE COURT:     . . . Okay.  Then the punitive damages
               instruction.

MR. FREKING:   No objection.

THE COURT:     Any objection?

MR. RYAN:      No objection.

(Trial Transcript, April 4, 2005, at 9)

*AFL-CIO, CLC*, 287 F.3d 476, 487 (6th Cir. 2002) (quoting *BMW*, 517 U.S. at 576).

Defendants argue that the punitive damage award is "clearly excessive."[13]  The court disagrees.

The jury concluded that the defendants would not have terminated plaintiff's employment but for the fact that they impermissibly considered her age in that decision.  The jury further found that defendants' violation was "willful."  Moreover, the chain of events leading up to plaintiff's termination and the vague testimony as to how that decision was reached -- and exactly who made the decision -- support the conclusion that defendants' behavior was "deliberate and akin to deceit" as opposed to merely negligent.  *Id.* at 488.

Further, the harm inflicted here was more than economic.  Jorling testified to being "devastated" at the loss of her job in a career that she had worked years to develop and in which she took enormous pride.  Yet defendants' testimony suggested that their decision was perfunctory and that they had little, if any, regard for the impact it had on Jorling's life.

As to proportionality, the $950,000 punitive damage award is

_____

[13]Defendants first argue that the statutory caps applicable to Title VII causes of action should "guide" this court.  However, the jury's award here of punitive damages was premised on an Ohio common law tort claim, to which the federal civil rights statutory caps do not apply.  The only guide for the court as to the excessiveness of such an award is authority outlining the constraints of constitutional due process.

exactly twice the amount of the total compensatory damages awarded ($425,000). This 2:1 ratio is far less than the 10:1 ratio approved by the Supreme Court in *BMW*, and it is less than other ratios approved more recently by the Sixth Circuit. *See Argentine*, 287 F.3d at 488 (upholding under *BMW* punitive damages award that was 42.5 times the compensatory award); *Jeffries v. Wal-Mart Stores, Inc.*, No. 99-4150, 2001 WL 845486, at *11 (6th Cir. July 20, 2001) (upholding 50:1 ratio in employment discrimination case).[14]

The punitive damages award thus will not be remitted.

### III. Motion for Attorneys' Fees and Costs

Pursuant to the remedial provisions of the ADEA, plaintiff as the prevailing party is entitled to recover her reasonable attorneys' fees and the costs of this action. *See* 29 U.S.C. § 626(b) (incorporating fee-shifting provisions of 29 U.S.C. § 216(b)).

In *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), the

---

[14]Defendants also argue that the punitive damages award is excessive when compared to HSI's revenues. However, this argument ignores the fact that ViaQuest is also a defendant against whom the jury found. The evidence at trial was that ViaQuest is a large employer, and defendants have proffered no evidence of its revenues to suggest that it is unable to satisfy the judgment here.

Supreme Court stated that the "most useful starting point for
determining the amount of a reasonable fee is the number of hours
reasonably expended on the litigation multiplied by the
reasonable hourly rate." Further, the "party seeking an award of
fees should submit evidence supporting the hours worked and rates
claimed." *Id.* "Where a plaintiff has obtained excellent
results, his attorney should recover a fully compensatory fee."
*Id.* at 435. However, counsel must make "a good-faith effort to
exclude from a fee request hours that are excessive, redundant,
or otherwise unnecessary." *Id.* at 434.

Here, plaintiff has submitted detailed fee statements in
support of her request for attorneys' fees and costs. The hourly
rates requested by plaintiff range from $385.00 for Randy
Freking, plaintiff's lead trial attorney, to $25.00 for a legal
assistant. The hourly rate requested for plaintiff's second
trial attorney, Elizabeth Loring, is $250.00.

Defendants do not challenge the hourly rates requested by
plaintiff's attorneys, and plaintiff has provided evidence that
these rates have been awarded in similar recent cases. The court
finds these rates to be reasonable in light of the market and
counsel's experience in handling employment discrimination
matters.

As to the hours expended in litigation of this matter,
defendants point out several errors in the time records, which
plaintiff has corrected in her reply brief. This results in a

27

deduction of $75.00 for attorney time spent in preparation of a press release, which plaintiff concedes is not recoverable.

Further, defendants argue that the entries reflect "excessive" time spent by plaintiff's counsel.  However, defendants do not state in what regard the time spent was excessive or duplicative.  The court has reviewed these time records and does not find the entries to be excessive or duplicative.  The court notes that the majority of the time spent litigating this case up to several months before trial was incurred by associates and paralegals whose hourly rates are far lower than that of plaintiff's lead trial attorney, Mr. Freking. This represents a reasonable allocation of resources that prevents attorneys with high hourly rates from performing litigation tasks that may be performed competently by less senior attorneys or paralegals.

The court also finds that the entries provide sufficient detail, read in context, to enable it to determine that the time was reasonably spent in pursuit of plaintiff's claims in this matter.  While the entries do not state in detail the substance of all conferences or phone conversations, such detail would likely be protected by the work product doctrine or the attorney-client privilege.  Further, plaintiff has sworn that these entries reflect work performed on plaintiff's case, and the time has been so recorded in plaintiff's counsel's billing system.

Plaintiff's documentation thus adequately supports her fee application.

However, defendants' argument that plaintiff's fee application improperly includes a $4,000.00 charge for a "jury consultant" is well-taken. A jury consultant is obviously not an attorney, paralegal, or legal assistant whose time falls within the rubric of "attorney fees" for purposes of the fee-shifting statutes. Moreover, "costs" recoverable under 28 U.S.C. § 1920 are those specifically enumerated, and "jury consultant" costs are not included.

Therefore, the court concludes that plaintiff may not recover the $4,000.00 sought for time spent by the jury consultant. *See Simon Prop. Group, L.P. v. Mysimon, Inc.*, no. IP 99-1195-C H/G, 2001 WL 66408, at *32 (S.D. Ind. Jan. 24, 2001) (holding that expenses for jury consultants are "obviously non-recoverable" under 28 U.S.C. § 1920); *Summerville v. Trans World Airlines, Inc.* No. 4:96CV02379, 1999 WL 33134345, at *4 (E.D. Mo. Sept. 28, 1999) ("Costs and fees associated with a jury consultant are not recoverable."); *Ryther v. KARE 11*, 864 F. Supp. 1525, 1533 (D. Minn. 1994) (similar).[15]

---

[15]The court notes that in *Summerville* and *Ryther*, the courts also disallowed the attorneys' time spent meeting with jury consultants. However, this court concludes that such time, particularly in employment discrimination cases, is time reasonably spent by a party's attorney in an effort to formulate an effective trial strategy.

29

In sum, plaintiff is entitled to recover attorneys' fees in the amount of $97,317.00[16] and costs of $5,53.42.

Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that: (1) defendants' motion for remittitur (Doc. #42) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**. The front pay award is remitted to $110,441.35. All other damage amounts remain unchanged; (2) plaintiff's motion for leave to file a surreply (Doc. #51) be, and is hereby, **GRANTED**; and (3) plaintiff's application for attorney's fees and costs (Doc. #43) be, and is hereby, **GRANTED**. Plaintiff shall recover from defendants her attorneys' fees in the amount of $97,317.00 and costs in the amount of $5,553.42.

An amended judgment shall enter concurrently herewith.

This 14th day of July, 2005.



Signed By:

*William O. Bertelsman* WOB

**United States District Judge**

---

[16]This figure represents the $100,267.00 requested, less the $75.00 mentioned above and the $4,000.00 jury consultant costs, plus the $1,125.00 in fees plaintiff incurred in briefing the fee application.